UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11969-RGS

PAUL SHEDLOCK

v.

PATRICIAN DOLAN, NP and AYSHA HAMEED M.D.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

May 26, 2010

STEARNS, D.J.

On November 14, 2008, Paul Shedlock, an inmate at the Massachusetts Treatment Center (MTC), brought this *pro se* federal civil rights Complaint against Nurse Practitioner (NP) Patrician Dolan and Dr. Aysha Hameed, members of the medical staff of UMass Correctional Health (UMCH). Shedlock, who suffers from radiculopathy of the lumbar spine and degenerative joint disease, alleges that defendants were, and continue to be, deliberately indifferent to his serious medical needs. More specifically, Shedlock alleges that the defendants "prevented [him] from obtaining the appropriate surgical decompression recommended by [neurosurgeon] Dr. Julian Wu."[1] Def. Opp. at 6.

BACKGROUND

The undisputed materials facts in the light most favorable to Shedlock as the

---

[1] Shedlock was evaluated as a candidate for a knee replacement at the Lemuel Shattuck Hospital (LSH) orthopedic clinic in September of 2004. Def. Statement of Undisputed Facts (SOF) ¶ 28. Although a total knee replacement was originally approved and scheduled for later that month, it was cancelled after the examining physician at LSH concluded that because of Shedlock's age, a regime of physical therapy was a more appropriate course of treatment. Id. ¶ 29.

nonmoving party are as follows.  The MTC is a treatment facility for sex offenders operated by the Massachusetts Department of Correction (DOC).  UMCH contracts with DOC to provide health care to inmates at MTC.  Dolan is a NP and Hameed a medical doctor. Both are employed by UMCH.  Shedlock brought this suit against Dolan, Hameed, and UMCH, alleging a violation of his rights to due process under the Fourteenth Amendment stemming from their failure to follow the surgical recommendations of Dr. Carl Kramer, a neurologist at LSH, and Dr. Wu, a neurosurgeon at Tufts Medical Center (Tufts).[2]

Shedlock's diagnoses include, among other ailments, cervical spinal stenosis, degenerative joint disease, carpal tunnel syndrome, neuropathy, and radiculopathy. Shedlock experiences pain, numbness, and weakness in his back, knees, hips, and extremities.  His history of medical treatment at MTC has included outside consultations, physical therapy, bunking and scheduling accommodations, surgery, medications, and medical support devices.  UMCH has also provided Shedlock with "routine chronic disease physical examinations, typically every three months."  Def. SOF ¶ 153.  A chronology of Shedlock's immediately relevant treatment history consists of the following.

On January 26, 2004,  Shedlock presented to Dr. Kramer with complaints of back pain radiating into his buttocks, as well as numbness and tingling in one of his feet.  Id. ¶ 13.  Dr. Kramer recommended an MRI of Shedlock's lumbar spine, medications, and bed rest.  The MRI revealed a mild herniation at the L4-L5 level with no evident effect on the exiting nerve root.  Id. ¶ 15.  Dr. Kramer prescribed Methocarbamol (a muscle relaxant)

---

[2]Shedlock alludes at times to a "conspiracy" between Dolan and Dr. Hameed to deny him medical care.

and Ibuprofen (a pain medication).  During a followup appointment on April 26, 2004, Dr. Kramer noted radiculopathy at L4-L5 and recommended a neurosurgical consultation.

Based on Dr. Kramer's recommendation, UMCH arranged orthopedic and neurosurgery consultations.  On May 19, 2004, Shedlock was seen by Dr. William Shucart, a neurosurgeon at Tufts.  The examination was "quite normal." Id. ¶ 22.  Dr. Shucart noted that the MRI showed no meaningful compromise of the nerve root, and the absence of any surgical lesion.  Dr. Shucart recommended that Shedlock continue on his medications. Shedlock was seen again by Dr. Shucart on September 16, 2004, who remained of the opinion that no surgical intervention was required.  Id. ¶ 24.  Dr. Shucart prescribed Neurontin for pain.  Shedlock was given knee sleeves, back braces, and ankle sleeves, and was assigned a bottom bunk and light work status.

UMCH arranged to send Shedlock to the orthopedic clinic at NEMC for a second opinion regarding a possible knee replacement.  On November 16, 2004, Shedlock was evaluated by a Dr. Donaldson, who diagnosed mild right knee degenerative joint disease. He prescribed physical exercise rather than surgery.  He also recommended a hip x-ray, which was taken on December 21, 2004.  The x-ray revealed "faint calcifications within the soft tissue . . . [but] no significant degenerative disease." Id. ¶ 34.  See also Def. Ex. 24. In response to Shedlock's complaints of increased knee and hip pain, his Neurontin dose was increased.  In February of 2005, Shedlock was referred to a second orthopedic consultation.  He was also given cortisone injections and the use of a wheelchair as needed.  Def. SOF ¶ 46; Def. Ex. 40.

X-rays of Shedlock's spine, pelvis, and right hip were taken on November 15, 2005.

3

Dr. W. Robert Courey, a radiologist, observed no significant change in Shedlock's lumbar spine from the most recent previous x-ray. He found no abnormality in Shedlock's pelvis, but noted a mild hypertrophic change indicating subtrochanteric bursitis. Dr. Courey concluded that "[t]he joint space and adjacent bony structures remain normal in appearance." Def. Ex. 46. On November 29, 2005, Shedlock was again placed on light work status, assigned to a bottom bunk, and provided a wheelchair or walker on request, as well as soft restraints for walking.

Shedlock complained of neuropathy in his right arm in December of 2005. He was continued on pain medications and instructed to apply moist heat to his elbow. He underwent a further x-ray of his spine on January 3, 2006. Based on the results of the x-ray, he was referred for physical therapy as well as a spinal MRI and an orthopedic assessment of the desirability of steroidal injections. Shedlock was also provided a walker with a seat.

In February 2006, Shedlock began physical therapy. On February 13, 2006, he underwent an MRI of his spine at NEMC. Based on the MRI results, Shedlock was referred to the neurosurgery clinic at NEMC. On April 19, 2006, Shedlock was evaluated by Dr. James Kryzanski, a neurosurgeon at NEMC. Dr. Kryzanski concluded that Shedlock's upper extremity symptoms were consistent with bilateral ulnar neuropathy. He recommended a follow-up with a neurologist and a possible EMG. Dr. Kryzanski felt that if his diagnosis of ulnar neuropathy was confirmed, Shedlock might benefit from peripheral nerve surgery.

Based on Dr. Kryzanski's findings, UMCH ordered an EMG. The May 3, 2006 EMG

confirmed ulnar entrapment.  NP Dolan then submitted a referral request to NEMC for a surgical consultation.  Shedlock was subsequently seen by Dr. Wu.  He recommended surgery to relieve ulnar entrapment syndrome.  Dr. Wu performed decompression surgery on June 16, 2006, at NEMC.  There were no post-surgery complications.  Shedlock continued receiving medication for pain.

Dr. Wu saw Shedlock on July 26, 2006.  Dr. Wu told Shedlock that the surgery would prevent any progression of ulnar neuropathy, but that a complete resolution was unlikely.  He recommended a repeat EMG in approximately six months if Shedlock's symptoms worsened.  On November 14, 2006, Shedlock underwent an EMG at NEMC.  The EMG revealed improvement ("no longer any evidence of ulnar entrapment neuropathy across the elbow on the right . . . the findings pertaining to the right ulnar nerve are improved compared with the prior study"), but found some symptoms unchanged ("the findings pertaining to the left ulnar nerve are unchanged compared to the prior study."). Def. Ex. 86.

In the following months, Shedlock continued to complain of pain in his back, hip and knee.  He remained on medication and on light work status with access to a bottom bunk, wheelchair and walker, knee sleeves, and wrist splints.  On March 2, 2007, Shedlock underwent an MRI of his spine at NEMC.  On March 13, 2007, Shedlock received an x-ray of his pelvis and hip.

On May 12, 2007, Shedlock reported that he had stopped taking Neurontin with minimal negative effects.  He continued receiving other pain medications such as Ultram.

On September 12, 2007, Shedlock returned to NEMC for a follow-up evaluation with

Dr. Wu.  Based on a physical examination, Dr. Wu was of the opinion that Shedlock was experiencing right C4 radiculopathy.  He discussed options for treatment including physical therapy, injections, medications, and surgical decompression.  During this visit, Shedlock claims that Dr. Wu told him that "if [he] chose to use an option other than surgery, [he] would probably need surgery in the future since [his] cervical spinal stenosis was progressive."  Shedlock Aff ¶ 11.  A consultation for cervical discectomy was requested, and Shedlock underwent diagnostic imaging of his hips and knees.  From September 2007 through December 2007, Shedlock continued on a pain medication regime consisting of Ultram, Codeine, and Motrin.  In November of 2007, his medical restrictions were renewed, and he received a cervical injection.

Shedlock was seen again by Dr. Wu at NEMC on January 4, 2008.  Dr. Wu prescribed physical therapy.[3]  During a March 2008 appointment, Shedlock complained to NP Dolan about his medical treatment and medications.  She referred him to another NP, Stanley Galas.  Dolan saw Shedlock again on May 26, 2008.  Shedlock reported numbness and pain in his right shoulder, neck, and cheek.  Dolan submitted a referral to NEMC neurosurgery, and Shedlock agreed to continue physical therapy.

On June 20, 2008, Shedlock's right knee was x-rayed.  He was given an ace bandage, but was not wearing it when he "twisted/injured" his right knee in a fall on June 24, 2008.  Def. SOF ¶ 105.  Dr. Brewer examined Shedlock at NEMC the following day. Dr. Brewer ordered an MRI and a follow-up appointment.  Shedlock was given Tramadol

---

[3]From January 2008 through June 2008, Shedlock continued to receive pain medications including Ultram and Motrin.

for pain.

Shedlock underwent another MRI of his spine on July 14, 2008.  On July 30, 2008, he attended a follow-up appointment with Dr. Brewer, and another on August 13, 2008. Dr. Brewer explained that Shedlock's MRI of July 21, 2008, indicated that he was not a candidate for surgery and referred him for additional physical therapy.  Shedlock continued taking Motrin and Neurontin.

During an October 30, 2008 appointment, NP Dolan had an "extensive conversation" with Shedlock about chronic pain management and the physical therapy services then available at MCI-Shirley.  Def. SOF ¶ 120; Def. Ex. 164.  Shedlock refused a transfer "to a prison setting" and "informed Dolan that as a civilly committed person he could not legally be confined with persons who are serving a punitive prison sentence." Shedlock claims that Dolan threatened him and insisted that he sign "the refusal" to transfer to MCI-Shirley and referred him to "Mental Health."  Shedlock Aff. ¶¶ 17-18; Opp. Mem. ¶ 18.

Following the appointment, Dolan referred Shedlock to LSH neurology for a re-evaluation of his treatment.  She also adjusted his Neurontin dose.  Shedlock underwent an EMG at Tufts on December 2, 2008.  The EMG did not identify any acute problem requiring immediate intervention.  Based on the EMG, UMCH determined that chronic pain management was the appropriate treatment course, along with the more powerful painkillers Oxycodone and Percodan.  Shedlock reported improved upper extremity and neck discomfort.

Shedlock attended a chronic pain management session with NP Dolan on January

15, 2009.  Among other subjects, he was instructed on weight loss goals.  On March 1, 2009, Dr. Hameed was assigned to evaluate Shedlock.  Dr. Hameed recommended changes in Shedlock's physical therapy exercises, and the application of moist heat, Bengay, and muscle relaxants.  Dr. Hameed also increased the strength of Shedlock's Oxycodone prescription.  Dr. Hameed advised Shedlock that he would never be completely free from pain.

On July 8, 2009, Shedlock was sent for a further neurosurgical consultation with Dr. Wu, who diagnosed Shedlock with "possible carpal tunnel and radiculopathy," and asked for an updated EMG.  Dolan faxed a copy of Shedlock's most recent EMG to Dr. Wu on July 17, 2009.   On July 24, 2009, Dr. Wu prepared an addendum report recommending nonsurgical treatment.  Based on Dr. Wu's recommendation, Shedlock's medications and strength exercises were continued and he was referred for an orthopedic consultation at LSH on October 15, 2009.  Shedlock underwent decompression surgery on his left side at LSH on November 11, 2009.

On February 20, 2010, Shedlock wrote to Dr. Wu asking him "about the discrepancy between the recommendation for surgery that he had made to Dr. Friedman and his current recommendation that 'non-surgical treatment' be the course of treatment."  Shedlock Aff. ¶ 21.  Dr. Wu responded on February 25, 2010, telling Shedlock that he would "be happy to answer all the questions in [his] letter" and directed Shedlock to "set up an appointment . . . and we can discuss in detail."  Id. ¶ 22.  On April 13, 2010, Shedlock again wrote to Dr. Wu.  He explained his inability to schedule his own appointments and asked Dr. Wu to answer him regarding the change in treatment

recommendation.  With this letter, the record ends.

DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Gaskell v. Harvard Co-op Soc., 3 F.3d 495, 497 (1st Cir. 1993).  "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party."  Rodriquez-Pinto v. Tirado-Delgado, 982 F.2d 34, 38 (1st Cir. 1993).  To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position.  Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).  If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]."  Id.  The nonmoving party "must adduce specific, provable facts demonstrating that there is a triable issue. There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'"  Id., quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).

In his Amended Complaint, Shedlock alleges that, contrary to "Due Process Clause of the Fourteenth Amendment to the United States Constitution," defendants Dolan and Dr. Hameed  "have interfered with, denied, and conspired to deny appropriate medical care for [his] serious and debilitating medical condition."  Am. Compl. at 1.   Shedlock asserts that defendants' choices of treatment therapies in his case were "contrary to

9

documented medical evidence of his disease, denied him the possibility of arresting the

progress of his disease, and denied him the possibility of a lessening of the debilitating

symptoms of his condition." Id.

In his Opposition Memorandum, Shedlock frames the legal issue as follows.

The Fourteenth Amendment requires the government to do more than provide the minimal civilized measure of life's necessities.   Here, Dolan cancelled surgery for Shedlock's cervical decompression and spinal fusion to treat the C3-C4 "paracentral disc protrusion, effacement of the central CFS [central spinal fluid] space, and right neural foraminal stenosis."  This had been ordered by Dr. Robert Friedman, the Site Medical Director, as a result of the report that had been sent to him by Dr. Julian Wu.  Accordingly, the question becomes one of whether Dolan's action has likely caused harm to the plaintiff, whether this likelihood was disregarded, Farmer v. Brennan, 511 U.S. 825, 836 (1994), and whether his condition is a "serious medical need."

Opp. Mem. at 3.

As an involuntarily committed person, Shedlock has a constitutional right to basic

and humane medical care provided by his warden, the State.  See Youngberg v. Romeo,

457 U.S. 307, 319 (1982).  While the right as it attaches to pretrial detainees and civilly

committed persons is guaranteed by the Fourteenth Amendment's Due Process Clause,

courts look for guidance to the Eighth Amendment's "deliberate indifference to serious

injury" test in fleshing out the contours of the guarantee.  See Hare v. City of Corinth,

Miss., 74 F.3d 633, 647-648 (5th Cir. 1996) (en banc).  See also Burrell v. Hampshire

County, 307 F.3d 1, 7 (1st Cir. 2002) ("Pretrial detainees are protected under the

Fourteenth Amendment Due Process Clause rather than the Eighth Amendment; however,

the standard to be applied [deliberate indifference] is the same as that used in Eighth

Amendment cases.").[4]

"Deliberate indifference," requires a showing that government officials had a "culpable state of mind and [the intent] to wantonly inflict pain." <u>DesRosiers v. Moran</u>, 949 F.2d 15, 18 (1st Cir. 1991).  Such indifference may be "manifested by prison doctors in their response to the prisoner's needs or by [other prison officials] in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." <u>Estelle v. Gamble</u>, 429 U.S. 99, 104-105 (1976).  <u>See also Helling v. McKinney</u>, 509 U.S. 25, 35 (1993) (deliberate exposure to second hand cigarette smoke); <u>Nelson v. Corr. Med. Servs.</u>, 583 F.3d 522, 529-531 (8th Cir. 2009) (en banc) (heedless shackling of the legs of a pregnant inmate during her final stages of labor); <u>Danley v. Allen</u>, 540 F.3d 1298, 1310-1311 (11th Cir. 2008) (deliberate refusal to permit a pepper-sprayed detainee the opportunity or means to decontaminate himself); <u>Harrison v. Barkley</u>, 219 F.3d 132, 137 (2d Cir. 2000) (refusal to fill an inmate's degenerating tooth cavity); <u>Wallis v. Baldwin</u>, 70 F.3d 1074, 1076-1077 (9th Cir. 1995) (deliberate exposure to asbestos); <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 68-69 (3d Cir. 1993) (prison doctor deliberately delayed a regimen of physical therapy).

A "serious" medical need is a condition that a reasonable physician would deem

---

[4]Shedlock argues that the Eighth Amendment "cruel and unusual punishments" standard does not apply to him because of his "civilly-committed status." <u>See</u> <u>Youngberg</u>, 457 U.S. at 322 ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). The distinction is a valid one, although neither the Supreme Court nor the First Circuit Court of Appeals has articulated a practical difference between the Eighth and Fourteenth Amendment standards in the context of institutional medical care.

worthy of treatment and which if left untreated could result in further significant injury or the unnecessary and wanton infliction of pain. Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997); Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (a condition "so obvious that even a lay person would easily recognize the necessity for a doctor's attention"). A committed person's desire for a purely elective procedure does not rise to the level of a serious need, the deprivation of which amounts to deliberate indifference. See Roe v. Crawford, 514 F.3d 789, 801 (8th Cir. 2008) (inmate's desire for an elective nontherapeutic abortion did not raise an issue of a serious medical need); Riddle v. Mondragon, 83 F.3d 1197, 1204 (10th Cir. 1996) (same, inmate's supposed condition of "addictive sexuality" was not a serious medical need requiring special treatment). See also Maggert v. Hanks, 131 F.3d 670, 672 (7th Cir. 1997) ("Withholding from a prisoner an esoteric medical treatment [sex change operation] that only the wealthy can afford does not strike us as a form of cruel and unusual punishment.").

"The right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice." Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981). See also United States v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987) (same, while "an inmate deserves adequate medical care, he cannot insist that his institutional host provide him with the most sophisticated care money can buy"). NP Dolan and Dr. Hameed provided Shedlock with regular medical appointments, consultations, and prescribed medications. While he complains that they deliberately ignored his request that he receive the surgery recommended by Dr. Wu in September of 2007, the record does not bear this out. Dolan, based on Dr. Wu's recommendation, referred Shedlock for a consultation for

a cervical discectomy (surgery).  Thereafter, Shedlock underwent a number of diagnostic examinations which led his medical providers, including Dr. Wu, to conclude that physical therapy and pain medications were the more appropriate course of treatment.

In sum, Shedlock was not denied treatment (the quantity and variety of the treatment he in fact received is somewhat astonishing).  Rather, Shedlock was denied the specific treatment that he unilaterally decided was appropriate.  See DesRosiers, 949 F.2d at  20 ("[A] claim of inadequate medical treatment which reflects no more than a disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment.").  This is especially the case where the disagreement over treatment or alternative therapies is not between an inmate and officials of the institution, but between an inmate and the medical professionals providing him with adequate and consistent care.[5]

Shedlock also claims that Dolan and Hameed conspired to deprive him of adequate

---

[5]There is another value served by a rule of deference to medical professionals.  The First Circuit has noted that

> [t]he Supreme Court [in Youngberg] emphasized that treatment and training decisions, if made by a professional are presumptively valid. Id. 457 U.S. at 323.  Liability (or as in our case, injunctive relief) may be "imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. (footnote omitted). The Court made clear that, by adopting a deferential standard, the federal judiciary's interference with the internal operations of state institutions would be minimized. Id. at 322.

Doe v. Gaughan, 808 F. 2d 871, 884, n.12 (1st Cir. 1986).

medical care.[6]  To sustain a claim of civil conspiracy, a plaintiff show that two or more persons combined to accomplish a legal or illegal purpose by unlawful means.  See J.R. Nolan & L.J. Sartorio, Tort Law § 6.3, at 142 (3d ed. 2005).  Because there is no plausible claim of unlawful methods or means, the conspiracy allegation falls of its own weight.

ORDER

For the foregoing reasons, defendants Dolan and Hameed's motion for summary judgment is ALLOWED.  The Clerk may now close the case.[7]

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED  STATES  DISTRICT  JUDGE

---

[6]This is the only specific complaint lodged by Shedlock against Dr. Hameed.

[7]UMCH was dismissed from the case on June 30, 2009.